**Opinion filed December 19, 2024**



In The

# Eleventh Court of Appeals

_____

## No. 11-22-00340-CR
_____

**ARMANDO GONZALEZ JR, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 441st District Court**
**Midland County, Texas**
**Trial Court Cause No. CR 56662**

## O P I N I O N

The jury found Appellant, Armando Gonzalez Jr., guilty of murder for a death arising from a motor vehicle accident wherein he was alleged to be intoxicated. The trial court sentenced Appellant to imprisonment for a term of sixty years in the Institutional Division of the Texas Department of Criminal Justice. The trial court additionally imposed a fine in the amount of $10,000. In a single issue on appeal, Appellant contends that the trial court abused its discretion when it refused to allow

his proposed expert to testify about flaws the expert claimed existed in the investigation by law enforcement. We affirm.

*Background Facts*

Omar Gomez testified that his wife, Noemi "Michelle" Gomez, was visiting him in Midland while he was there for work. Michelle and Omar met Appellant, one of Omar's close friends, at Appellant's home on a Saturday night. The three went out together, and Appellant drove Michelle's vehicle the entire night because he was familiar with the area. They went to dinner and two bars and drank alcohol throughout the night. They left the second bar after closing. Omar testified that Appellant was driving, Omar was in the front passenger seat, and Michelle was in the rear passenger seat behind Omar. Omar was intoxicated, and Appellant had to pull over so that Omar could vomit at one point during the drive.

Omar fell asleep in the vehicle and woke up to "an impact" hitting the right side of his head. At first, Omar thought Appellant had only crashed into a fence, and he became confused when he saw Appellant pulling Michelle out of the vehicle. Omar could not open his door and climbed out of the driver's side of the vehicle. Omar was unable to tell if Michelle was breathing and began performing CPR on her.

Catarino Natividad testified that the crash happened in front of his home at around 2:30 a.m. Natividad's daughter called 9-1-1. Natividad saw Omar performing CPR on Michelle and saw Appellant standing off to the side. Natividad testified that he saw Appellant talking to someone on the phone and heard him telling the person that "he was going to need help on this one, that he had really messed up, and not to let him down."

Deputy Rigoberto Munoz, Jr. with the Midland County Sheriff's Office was the first officer on scene. Deputy Munoz moved Omar off of Michelle in order to

2

"preserve the scene." Appellant told Deputy Munoz that he had been the person driving the vehicle and that he "had an accident."

Michelle suffered fatal injuries in the accident, including a "gaping laceration" and "penetrating injury" on the right side of her neck, a fractured jaw, "fractures of two of the upper bones of the spine at the base of the skull," multiple fractures to the base of her skull, and injuries to her brain and brain stem. Dr. Tasha Greenberg, the medical examiner who performed Michelle's autopsy, testified that these injuries caused Michelle's death and that Michelle's death was "very fast."

Corporal Nathaniel Barker with the Texas Highway Patrol testified that the vehicle had first gone "airborne or had very little contact of the ground" at an intersection before coming back down onto the pavement and "bottom[ing] out." The vehicle then began "side skid[ding]" and hit a metal dumpster. The vehicle dragged the dumpster with it as it entered into a private drive and went through a fence before coming to a stop. The dumpster caused "significant damage" to the passenger side of the vehicle, particularly to the rear passenger door. Part of the dumpster went through the vehicle door and intruded into the passenger compartment. Corporal Barker testified that "there were things [that the officers on scene] could have done better," but the officers "all felt it was pretty clear" that Appellant was the person driving the vehicle at the time of the accident.

The State called Sergeant Jon Shock with the Texas Department of Public Safety to testify as an expert in crash reconstruction. Sergeant Shock reviewed the black box data from the vehicle. Five seconds before the crash, the vehicle's speed was recorded at "just under 97 miles an hour." The brakes were activated "about a second and a half" before impact, causing the vehicle's ABS system to activate. The turning pattern of the steering wheel indicated that there was a loss of control of the vehicle.

3

Trooper Nicholas Henson with the Texas Department of Public Safety was the lead investigator of the crash. His body camera video and dash camera video were admitted and played for the jury. Trooper Henson testified that another trooper and deputy had arrived at the scene before he did. The other trooper on the scene told Trooper Henson that the driver was in a gray shirt. Trooper Henson walked over to the two men sitting on the pavement and asked them who the driver was. The man wearing a gray shirt raised his hand. Trooper Henson later identified the man, who said he was the driver, as Appellant. Appellant admitted multiple times that he was the driver of the vehicle.

Appellant told Trooper Henson that he drank three alcoholic beverages that night and that his intoxication level was at a "two, two point five" on a scale of one to five. Trooper Henson arrested Appellant for intoxication manslaughter. Appellant told Trooper Henson that he had been arrested for driving while intoxicated twice before. Trooper Henson testified that, while in route to the jail to obtain a sample of Appellant's blood, Appellant said that he "deserve[d]" jail time for "manslaughter." Trooper Henson testified that Appellant's blood was drawn "a little more than two hours" after the crash, and the test revealed that Appellant had a blood alcohol content of 0.146.

When a nurse at the jail asked Appellant if he was bleeding anywhere, Appellant responded, "Not that I know of." Trooper Henson testified that he did not see any visible injuries on Appellant. Appellant was subsequently taken to the hospital, and his medical records stated that he had subcutaneous bruising on his right chest wall, "likely from [a] seat belt injury," and a fractured tooth.

Trooper Henson explained that fatality crashes typically involved "multiple troopers" and that "everybody splits duties and takes different responsibilities." Trooper Henson testified that his "main focus" was speaking with Appellant, while some of the other troopers were making a scale diagram of the scene, gathering

4

evidence, taking photographs, and gathering witness statements. When asked whether it was "procedure to retain [vehicles] as evidence," Trooper Henson said that it was not, and that the only time he had seen a vehicle retained as evidence was when officers "had no idea who was in the vehicle at all." Trooper Henson said that the vehicle did not need to be retained as evidence in this case because his investigation and Appellant's own statements led him to conclude that Appellant was the driver.

On cross-examination, Trooper Henson testified that he did not collect any DNA samples because, in his experience, "it wasn't common practice" to do so. Trooper Henson said that he did not attempt to retrieve fingerprints from the steering wheel because he would not be able to determine when the fingerprints had been left on the steering wheel. Trooper Henson conceded that he "could [] have done a better job" investigating who was sitting in the passenger seat and who was driving, but testified that he did not investigate further because Appellant "admitted multiple, multiple times to being the driver."

Trooper Levi Wilcox with the Texas Department of Public Safety spoke with Omar at the scene. Trooper Wilcox testified that Omar had a gash on the right side of his head that looked like it had been bleeding. Omar told Trooper Wilcox that he was sitting in the front passenger seat. Trooper Wilcox testified that Omar's wound could have caused the smear of blood seen on the vehicle's front passenger side airbag. Trooper Wilcox testified that collecting DNA evidence to determine who the driver of the vehicle was could have "[p]ossibly" been prudent, but he had "never been on a scene of an accident that we did that."

The defense sought to offer Antonio Leal to testify as an expert witness. Leal was employed as a state trooper with DPS before becoming a licensed private investigator. Leal received crash reconstruction training and was a member of a crash reconstruction team while working for DPS. Appellant sought to offer Leal as

5

an expert in "crime scene investigation and collection of evidence at a crime scene." The State objected, asserting that:

> [I]nvestigating and report writing and all of those things are neither a hard science nor a soft science.
>
> If Mr. Leal were here representing himself as an expert in crash [reconstructions], I would say . . . that he is just as qualified as Sergeant Shock that we had testify earlier.
>
> However, as [trial counsel] just put forward, he's trying to purport him to be an expert in investigations, which is not a science at all. It is not an accepted -- there's no peer review. There's no -- it's not a science, Judge.
>
> It's not a soft science like therapy. It's not a hard science like crash reconstruction. It's somebody who used to do something coming in and nitpicking somebody else's work."

The trial court permitted the State to question Leal on voir dire. Leal testified that he was given eight photographs, medical records, Michelle's autopsy, and the DPS "major crash packet" that had been completed. Leal was not given any videos or CDR data. Leal testified that he could have done a more thorough investigation if he had been given all of the photographs, videos, and information gathered in the case. Leal was "surprised" that Appellant had admitted his guilt, which was in the videos Leal did not receive. The State renewed its objection, asserting that Leal was "trying to be put forth as an expert in a field that does not exist" and that "he wasn't given all of the information and, therefore, could not have done a thorough report."

Appellant's trial counsel responded to the State's objection and was permitted to ask Leal more questions. Leal agreed that the main purpose of his testimony was to "tell the jury how the investigation done by [Trooper] Henson was conducted." Appellant's trial counsel asked Leal what additional knowledge his expertise could

give the jury, and Leal responded that he noticed a "lack of thoroughness in the case, as far as working a crime scene."

Appellant's trial counsel then asked the trial court to admit Leal as an expert in "crime scene reconstruction." The trial court asked Leal if he was a crime scene reconstructionist, and Leal responded that he was because he had "advanced crime scene reconstruction training." The trial court noted that Leal's report contained "corrections or criticisms" of the paperwork filled out by the troopers and investigators on scene, but did not have "any conclusions or, better yet, opinion as to the result of an accident reconstruction." Relying on Rule 705 of the Texas Rules of Evidence, particularly Rule 705(c), the trial court ruled that Leal's opinion was inadmissible "because the underlying facts or data do not support a sufficient basis for the opinion. And that particular opinion would be . . . accident reconstruction, and find that he is not an expert in that field."

*Analysis*

Appellant asserts that the trial court abused its discretion when it did not allow Leal to testify as an expert about his perceived deficiencies in the crash investigation. During both his opening statement and closing argument, Appellant's trial counsel asserted that Appellant was not driving the vehicle when it crashed and that "all of this could have been prevented" if the investigating officers had "done their job." Appellant's trial counsel specifically contended that investigating officers should have swabbed the vehicle for DNA, fingerprinted the steering wheel, and taken the other surviving passenger to the hospital to see whether he was injured.

"A trial judge's ruling on the admissibility of expert testimony is reviewed under an abuse-of-discretion standard and will not be disturbed if it is within the zone of reasonable disagreement." *Wolfe v. State*, 509 S.W.3d 325, 335 (Tex. Crim. App. 2017) (citing *Russeau v. State*, 291 S.W.3d 426, 438 (Tex. Crim. App. 2009)). "Absent a clear abuse of that discretion," we will not disturb the trial court's decision

7

to admit or exclude testimony. *Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000). We review the trial court's ruling in light of the evidence before the court at the time of the ruling. *Rodgers v. State*, 205 S.W.3d 525, 528–29 (Tex. Crim. App. 2006) (citing *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000)). We will uphold the trial court's evidentiary ruling if it is correct on any theory of law applicable to that ruling, "even if the trial judge gave the wrong reason for his right ruling." *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009) (citing *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002)).

A trial judge must make three separate inquiries before admitting expert testimony: "(1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact-finder in deciding the case." *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006) (quoting *Rodgers*, 205 S.W.3d at 527). These inquiries are referred to as "(1) qualification, (2) reliability, and (3) relevance." *Id.* at 131. The second and third inquiries are particularly relevant here.

In order to be reliable, an expert's testimony must be within the scope of his field of expertise and must properly rely upon and/or utilize the principles involved in that field. *Rhomer v. State*, 569 S.W.3d 664, 671 (Tex. Crim. App. 2019) (citing *Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998)). Appellant's trial counsel originally asserted that Leal was an expert in "crime scene investigation and collection of evidence at a crime scene." But after additional questioning, Appellant's trial counsel offered Leal as an expert in "crime scene reconstruction."

It appears that there may have been some confusion at trial with respect to counsel's use of the term "reconstruction." The confusion stems from the fact that, often times, an expert is called to testify as an accident reconstructionist when a motor vehicle collision is involved. For example, the Texas Court of Criminal

Appeals addressed an expert called to testify about accident reconstruction in *Rohmer*. 569 S.W.3d at 670–72. However, sometimes the term "crime scene reconstruction" is used to refer to an expert that intends to testify as to the manner in which a crime scene was investigated by law enforcement. *See Gonzales v. State*, 680 S.W.3d 358, 388 (Tex. App.—Eastland 2023, pet. ref'd); *Nadeau v. State*, No. 05-19-01137-CR, 2022 WL 3053917, at *4 (Tex. App.—Dallas Aug. 3, 2022, pet. ref'd) (mem. op., not designated for publication); *Stirman v. State*, No. 11-12-00090-CR, 2014 WL 1285773, at *2–3 (Tex. App.—Eastland Mar. 31, 2014, pet. ref'd) (mem. op., not designated for publication). The confusion here was certainly understandable given that an automobile collision led to Michelle's death.

On appeal, Appellant focuses on his trial counsel's offer of Leal as an expert in crime scene investigation and evidence collection. Appellant contends that Leal's testimony was analogous to the nonscientific expert field of "police practice" because Leal "sought to highlight grave deficiencies in the police investigation." Appellant asserts that Leal's testimony was "essential" because the jury might not have understood the significance of the investigating officers' failure to collect DNA evidence or fingerprints from the steering wheel.

Appellant cites two federal civil cases that discuss expert testimony about police practice. *See Ikhinmwin v. Rendon*, No. SA-16-CV-184-OLG (HJB), 2017 WL 10768507, at *1 (W.D. Tex. Oct. 2, 2017); *Perez v. City of Austin*, No. A-07-CA-044 AWA, 2008 WL 1990670, at *1 (W.D. Tex. May 5, 2008). These civil cases are readily distinguishable from a criminal prosecution. Appellant does not cite to any criminal cases from Texas in support of his proposition that Leal's testimony was admissible because he was testifying as a police practice expert.

In *Work v. State*, the Amarillo Court of Appeals held that a private investigator's opinion that a police investigation was not sufficiently thorough was irrelevant because it would not have been helpful to the jury in determining a fact in

9

issue. *Work v. State*, 07-17-00286-CR, 2019 WL 5861993, *3 (Tex. App.—Amarillo 2019, pet. ref'd) (mem. op., not designated for publication). The same is true here. Leal did not explain how his opinion that the DPS investigation was deficient would have assisted the jury in determining a fact at issue. When Appellant's trial counsel asked Leal what additional knowledge his expertise could give the jury, Leal responded that he noticed a "lack of thoroughness in the case, as far as working a crime scene." However, the jury had already been made aware of the fact that the investigating officers did not obtain DNA samples or fingerprints. Further, the jury heard Troopers Henson, Wilcox, and Barker testify that taking DNA swabs and fingerprints from the vehicle could have provided additional corroboration that Appellant was the driver.

The key fact issue in this case was whether Appellant was driving the vehicle when it crashed. Leal did not have an opinion that someone else was driving the vehicle. Instead, his opinion was that the DPS troopers did not do enough to confirm that Appellant was the driver even though Appellant told the officers at the scene of the accident that he was the driver.

The jury was able to consider Omar's testimony that Appellant was driving, Natividad's testimony that Appellant told someone on the phone that he "had really messed up, and not to let him down," Deputy Munoz's testimony that Appellant told him he was driving and that he "had an accident," and Appellant's numerous video-recorded admissions that he was the driver. Thus, Appellant's status as the driver was ultimately a credibility issue for the jury to determine. *See Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) ("[T]he jury is the sole judge of the witnesses' credibility and the weight to be given their testimony."). As was the case in *Work*, Leal's proposed testimony that the DPS investigation was incomplete was not relevant to the whether the jury believed Appellant's statements that he was the

driver as well as the testimony from Omar and Natividad that Appellant was the driver. *See Work*, 2019 WL 5861993 at *3.

In *Floyd v. State,* the Alabama Court of Criminal Appeals addressed whether an expert could testify about the sufficiency of the police's investigation of a murder in order to opine that the investigation was "flawed." *Floyd v. State*, 289 So. 3d 337, 413 (Ala. Crim. App. 2017). The court concluded that testimony of this character would not assist the trier of fact to understand the evidence or to determine a fact in issue. *Id.* ("The purpose for which Remus's testimony was offered -- to point out the alleged deficiencies in the police investigation of Jones's murder -- is not a proper subject of expert testimony because it would not assist the trier of fact in understanding the evidence or deciding a fact in issue."). Further, the court cited cases from other jurisdictions that had reached the same conclusion. *Id.* at 413–14.

One of the cases cited by the court in *Floyd* was *Mason v. United States*, 719 F.2d 1485 (10th Cir. 1983). *Id.* The court in *Mason* rejected the defendants' attempt to introduce the testimony of an expert regarding the inadequacy of the investigative techniques employed by the police. 719 F.2d at 1490. As explained by the Tenth Circuit in *Mason*:

> As we view it, the presentation of expert testimony criticizing the presentation of the other side of the case is not appropriate. It may be a proper subject for comment by the lawyers in their final arguments and seemingly the defendants' attorneys discussed the inadequacies in their final arguments to the jury. We conclude the trial court acted properly in excluding the testimony of defendants' expert.

719 F.2d at 1490.

We agree with the reasoning employed by our sister court in *Work*, as well as the rationale utilized by the Alabama Court of Criminal Appeals in *Floyd* and the Tenth Circuit in *Mason*. As noted by the court in *Mason*, complaints about a flawed law enforcement investigation are not properly presented by expert testimony, but

11

rather they are more appropriate for closing argument or perhaps cross-examination of the officers involved in the investigation. *See id.* Accordingly, the trial court would not have abused its discretion as the gatekeeper if it determined that Leal's testimony would not have helped the trier of fact. *See Rhomer*, 569 S.W.3d at 670; *De La Paz*, 279 S.W.3d at 344. In light of the wide discretion we afford the trial court regarding the admissibility of expert testimony, we cannot say that the trial court abused its discretion in ruling that Leal's opinion was not admissible. *See Wyatt*, 23 S.W.3d at 27. We overrule Appellant's sole issue.

*This Court's Ruling*

We affirm the judgment of the trial court.

JOHN M. BAILEY

CHIEF JUSTICE

December 19, 2024

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.